**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,  )<br>  )<br>             Plaintiff,  )<br>  )<br>vs.  )<br>  )<br>Eric John Meisner,  )<br>  )<br>             Defendant.  )<br>_____) | CR 04-1073-PCT-DGC<br><br>**ORDER** |

Defendant Eric John Meisner has been charged with possession with intent to distribute five kilograms or more of cocaine. The cocaine was found concealed in Meisner's car during a traffic stop. Meisner filed a motion to suppress evidence obtained as a result of the traffic stop. Doc. #32. The parties have filed additional responsive and supplemental briefs. Docs. ##37, 39, 46, 48, 70, 72. The Court held an evidentiary hearing on May 16, 2006, and heard testimony from Defendant and the Arizona Department of Public Safety ("DPS") officers involved in the stop. The Court also viewed a videotape of the traffic stop made by a camera in the DPS patrol car. The Court concludes that the traffic stop and search of Defendant's vehicle did not violate his constitutional rights.

**I.   FACTUAL BACKGROUND.**

On September 6, 2004, Defendant and Dana Pinchot were traveling north on Interstate 17 near Flagstaff, Arizona. DPS Officer Mace Craft was stationed in the median north of milepost 339, monitoring northbound traffic. As Defendant's car approached, Craft suspected the car was speeding. Craft's radar confirmed that Defendant was traveling 62

miles per hour, seven miles per hour faster than the posted speed limit. Craft began following Defendant's car and pulled it over after it turned onto Interstate 40. The video camera in Craft's patrol car began recording the stop when he activated his lights and siren.

As Craft exited his patrol car, he forgot to turn on his personal microphone. Thus, although the entire traffic stop is recorded by videotape, several minutes have no sound. Craft testified at the hearing concerning the conversations that occurred during this period.

Craft approached the car on the passenger's side and requested Defendant's license and the vehicle registration. As he stood at the car window, he noticed that Pinchot was shaking uncontrollably and that both occupants were making quick movements. Craft noticed a bottle of spray air freshener between the front seats and an open box of dryer fabric softening sheets on the passenger side of the back seat. Both occupants engaged in small talk and appeared overly friendly. Craft testified from his training and experience that air fresheners are often used by drug smugglers as a masking agent for the smell of narcotics.

Craft asked Defendant to come back to his patrol car to answer some questions. Defendant complied. In response to Craft's questions, Defendant said they were traveling from Las Vegas to Oklahoma City. As the most direct route for this trip is Interstate 40, Craft asked why they were traveling north on Interstate 17. Defendant stated that they had stopped at a casino named "Mata-something." Craft knew of no such casino on Interstate 17. While speaking with Defendant beside his patrol car, Craft noted that Defendant was pacing and wiping his hands on his trousers.

Craft examined the rental contract for the vehicle and noticed that it was past due. The vehicle was to have been returned in Las Vegas the previous day. Craft then approached the passenger's side of the vehicle a second time and spoke briefly with Mr. Pinchot. Pinchot stated that he and Defendant were traveling from Las Vegas to New Jersey (not Oklahoma). Craft noticed that Pinchot was "fidgety" and avoided making eye contact.

After issuing a warning and receiving confirmation that there were no outstanding warrants for Defendant's arrest, Craft wished Defendant a safe trip. As Defendant began walking back to his vehicle, Craft asked if he would respond to a few additional questions.

1  Craft then informed Defendant that there was much criminal activity on the interstate and
2  asked if Defendant was carrying illegal drugs. Defendant said no and suggested that Craft
3  could search the vehicle if he wished. Craft confirmed that Defendant consented to a search.
4  After obtaining the passenger's consent, Craft began his search.

5  While searching, Craft found a receipt that showed the vehicle had been in Tucson the
6  day before and that $2,000 had been wire transferred from Tucson. He also found machine-
7  sealable "food saver" bags in the trunk – bags he knew to be used by drug smugglers.

8  Craft and another officer who joined him at the scene found that the rear passenger-
9  side window of the vehicle could not be lowered. It also appeared that the rear passenger-
10 side door panel had recently been removed. As Craft began examining the door more
11 closely, Defendant approached and asked what would happen if he withdrew his consent to
12 the search. Craft informed him that he was free to withdraw his consent, in which event
13 Craft would request a K-9 unit to conduct a drug sniff of the vehicle. Defendant then stated
14 that Craft could continue his search. Shortly after Craft returned to the rear passenger door,
15 Defendant approached again and withdrew his consent. Craft called for a K-9 unit.

16 While awaiting arrival of the K-9 unit, Craft and the other DPS officer suggested that
17 Defendant and Pinchot could sit in the rear of the patrol vehicle to remain warm on the chilly
18 evening. A K-9 unit arrived approximately 40 minutes after it had been called. K-9 officer
19 John Adams testified that he was awakened and called to the scene shortly after midnight.
20 He dressed, retrieved his dog, and reported to the scene as quickly as possible. The drug
21 sniffing dog, which Officer Adams characterized as "exceptionally" reliable, promptly
22 alerted to the rear of the car. On the basis of this alert, Officer Craft continued his search and
23 located approximately 16 pounds of cocaine in the rear passenger door panel. Defendant was
24 then placed under arrest.

25 **II.    THE TRAFFIC STOP AND SEARCH WERE CONSTITUTIONAL.**

26 "The constitutionality of an investigative detention is judged under the framework
27 established in *Terry v. Ohio*, 392 U.S. 1 (1968), requiring that the scope of an investigative
28 detention 'must be carefully tailored to its underlying justification . . . and may last no longer

- 3 -

than is necessary to effectuate the purpose of the stop.'" *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). An officer must initially restrict the questions he asks during the stop to those reasonably related to the justification for the stop, and may expand the scope of the stop only if he notices particularized, objective factors arousing his suspicion. *See id.*; *U.S. v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002).

### A. The Initial Stop Was Valid.

Craft testified that his radar clocked Defendant traveling 62 miles per hour in a 55-mile-per-hour zone. On cross-examination, defense counsel noted that Craft's report states that he was stopped at milepost 339 on Interstate 17. Defendant then introduced a photograph showing that the 55-mile-per-hour sign is located north of milepost 339. In response, Craft testified that the 55-mile-per-hour sign is approximately three-tenths of a mile north of milepost 339 and that his vehicle was positioned north of the sign. Craft testified that Defendant was traveling 62 miles per hour after he had passed the sign. The Court found this testimony to be credible.

A law enforcement officer may stop a driver without violating the Fourth Amendment when the officer has probable cause to believe that a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996). Craft had probable cause to believe Defendant was speeding. The stop was valid.

### B. Other Actions During the Stop Did Not Violate the Fourth Amendment.

Having made a valid stop of Defendants' car, Craft was permitted to ask questions and take other actions reasonably related to the purpose of the stop. *See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001). The Fourth Amendment was violated only if he expanded the stop beyond its permissible scope without a suspicion based on particularized, objective factors. *See Chavez-Valenzuela*, 268 F.3d at 724. The Court's Fourth Amendment analysis must ultimately be based on the totality of the circumstances involved in the stop. *See United States v. Arvizu*, 534 U.S. 266, 273-74 (2001); *United States*

*v. Hernandez*, 313 F.3d 1206, 1212 (9th Cir. 2002). Initially, however, the Court will address each element of the stop discussed by the parties in briefing and at the hearing.

Craft began by asking Meisner for his driver's license and vehicle registration. Such a request is permitted under the Fourth Amendment as part of a traffic stop. *See Chavez v. Valenzuela*, 268 F.3d at 724.

Craft asked Meisner to exit the vehicle and come back to his patrol car. He testified credibly during the hearing that he routinely takes this step for his own safety. Reasonable measures undertaken for officer safety do not violate the Fourth Amendment. *See Terry*, 392 U.S. at 23-24. Moreover, the Ninth Circuit has held that separating individuals for questioning does not violate their Fourth Amendment rights. *United States v. Bautista*, 684 F.2d 1286, 1289-91 (9th Cir. 1982).

Craft asked Meisner where he was traveling and where he had been. Such questions are permissible as part of a traffic stop. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (implying questions about travel plans are permissible); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999) (stating that questions about a driver's purpose for traveling were reasonably related to a traffic stop for speeding); *Chavez-Valenzuela*, 268 F.3d 724 n.4 (citing *Pruitt* and *Hill* favorably on this point).

Craft also asked Pinchot questions during the traffic stop. Pinchot responded voluntarily. The Ninth Circuit has observed that "[s]ometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered[.]" *Bautista*, 684 F.2d at 1290 n.3. The Fourth Amendment does not prohibit an officer from conferring with passengers about travel matters during a traffic stop. *See Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Ayon-Meza*, 177 F.3d 1130, 1133 (9th Cir. 1999).

Following completion of these steps, Craft issued a written warning to Meisner and told him to have a safe trip. The entire stop to this point had taken less than ten minutes. "[T]he Supreme Court specifically [has] refused to set a definitive rule on the time limit of a lawful investigative stop, finding instead that the circumstances of each case must be considered." *United States v. Torres-Sanches*, 83 F.3d 1123, 1128 (9th Cir. 1996) (citing

- 5 -

*United States v. Sharpe*, 470 U.S. 675, 685 (1985)). The circumstances of this case show that Craft did not delay unreasonably or take an unnecessary amount of time to issue the warning. *See id.* at 1127-29 ("upon reviewing the totality of the circumstances, we find Sanchez being seated in [the] patrol car 20 minutes to be reasonable[.]").

Defendant asserts that the traffic stop ended once Craft obtained the license and registration – that nothing more was needed to complete the warning – and that the actions he took thereafter exceeded the permissible limits of the traffic stop. The Court disagrees. The ten minutes from the beginning of the stop to issuance of the warning were used to complete steps reasonably related to the stop – obtaining the license and registration, checking Meisner's and Pinchot's identity by radio, and completing the paperwork required for the warning. Each of these actions reasonably can be viewed as part of a single traffic stop. *See id.* at 1129. The Court will not parse the stop as Defendant suggests. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("[I]n evaluating the validity of a stop[,] . . . we must consider 'the totality of the circumstances – the whole picture.'"). Nor did Craft's questioning of Defendant during these actions extend the duration of the stop.

What is more, by the time Craft issued the warning he had identified particularized, objective factors that justified extending the stop. These included Pinchot's nervousness, the Defendant's and Pinchot's quick actions, the can of spray air freshener between the front seats, the open box of dryer sheets on the back seat, the inconsistent responses as to where Defendant and Pinchot were traveling, the unusual route Defendant was taking if he was traveling from Las Vegas to Oklahoma, the fact that there is no "Mata-something" casino on Interstate 17, Defendant's pacing and wiping his hands on his pants while waiting beside Craft's patrol car, and the rental contract for the automobile that showed it should have been returned the previous day in Las Vegas. *See, e.g.*, *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001) (nervousness); *United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994) (nervousness and traveling from a drug source area to a distribution area); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1347 (9th Cir. 1996) (air fresheners to mask the odor of drugs); *United States v. Oba*, 978 F.2d 1123, 1128 (9th Cir. 1992) (inconsistent answers and

1  vague explanations). These particularized, objective factors, taken together, supported
2  Craft's reasonable suspicion that drugs were being transported and justified extension of the
3  stop to inquire about possible drug trafficking. *See id*; *Royer*, 460 U.S. at 497; *Ayon-Meza*,
4  177 F.3d at 1133.

5  Defendant suggests that each of the factors, taken alone, could be entirely innocent,
6  but this does not render the stop unconstitutional. It was the cumulative effect of these
7  factors that gave rise to Officer Craft's suspicion of drug trafficking, and Courts repeatedly
8  have held that the totality of circumstances must be considered. *See Arvizu*, 534 at 273-74;
9  *Hernandez*, 313 F.3d at 1212. The Court finds that Officer Craft's suspicion was reasonable
10 and based on particularized, objective factors.

11 Defendant argued at the hearing that there is in fact a casino on Interstate 17 named
12 Cliff Castle Casino and that it is located at the Montezuma Castle exit. Defendant argued
13 that he simply had been confused about the exit name – Montezuma Castle – when he had
14 said the casino was named "Mata-something." But Defendant's confusion about these facts
15 was not known to Craft at the time of the traffic stop. The question to be addressed in this
16 motion is not whether Defendant had a reasonable explanation for his mistake about the
17 name, but whether Craft had objective, particularized facts sufficient to support a reasonable
18 suspicion based on the totality of the circumstances. The Court concludes that Defendant's
19 having named an unknown casino added to the totality of the facts giving rise to a reasonable
20 suspicion.

21 Defendant argues that Officer Craft lied when he implied that Defendant was free to
22 leave after the warning was issued. Officer Craft candidly admitted during the hearing that
23 he would not have permitted Defendant to leave the scene once he formed a reasonable
24 suspicion that drugs were being transported. The Court concludes, nonetheless, that this stop
25 and investigation were valid. By the time Officer Craft completed issuing the warning he
26 had obtained sufficient objective facts to justify extending the traffic stop. The fact that he
27 extended the stop after implying that Defendant was free to leave does not eliminate the
28 reasonable suspicion upon which the extension was based.

Nor did Officer Craft's suggestion that Defendant was free to leave render Defendant's consent to search invalid. Officer Craft asked if he could search Defendant's vehicle after informing Defendant that Arizona had drug trafficking problems and asking Defendant if he was transporting drugs. Thus, Defendant knew precisely why Officer Craft wanted to search the car. Defendant readily consented to the search. In fact, Defendant suggested that Craft search the vehicle before Craft asked.

Upon conducting the search, Craft found additional evidence that justified extending the search – the Tucson receipt, food saver bags, non-functioning window in a relatively new rental car, apparent tampering with the rear passenger side door, and Defendant's withdrawal of his consent once Craft began looking closely at the rear passenger side door. Craft clearly had a reasonable basis for requesting a drug-sniffing dog. The dog was transported to the scene as quickly as possible. Almost immediately upon arriving, the dog alerted to the presence of drugs in the vehicle. These events did not violate Defendant's Fourth Amendment Rights.

**III.   ALLEGED VIDEOTAPE TAMPERING.**

Defendant claims that the videotape from Officer Craft's patrol case has been altered. The Court finds that this argument is not plausible.

The videotape began recording when Officer Craft activated his lights and siren to pull over Defendant's vehicle. The tape runs continuously until Defendant is taken into custody more than one hour later. The timer in the lower right-hand corner of the videotape runs continuously and without interruption from the initial activation to the final arrest. Officer Craft testified that he knows of no way to edit or alter a videotape with his patrol car's equipment. He further testified that he personally removed the videotape from his patrol car's recording device, initialed and dated it, and that the videotape has been retained in the Government's custody.

The Court did not find Defendant's testimony regarding omissions from the tape to be credible. Defendant testified that Officer Craft first approached the driver's side of his vehicle, had Defendant step out of the vehicle, and engaged in aggressive questioning, none

of which is shown on the tape. The video tape shows Defendant's vehicle being pulled to the side of the road, followed immediately by Officer Craft approaching the passenger's side of the car and engaging in a conversation with Defendant and the vehicle's other occupant. The videotape runs continuously throughout this event with the timer running continuously as well.

Defendant testified that the tape does not show Officer Craft's initial opening and search of the trunk, steps he allegedly took after withdrawing the keys from the automobile and walking back to open and search the trunk by hand. In fact, the videotape shows Officer Craft opening the trunk later in the stop and examining the contents of the trunk for the first time. He stands and scans the items in the trunk with his flashlight before beginning to move the items on top. This would not be the conduct of an officer who previously had opened the trunk and searched through the items as claimed by Defendant.

Defendant testified that Officer Craft asked him about food saver bags during a segment that is not shown on the videotape. In fact, this question is shown on the videotape. Similarly, Defendant testified that Officer Craft asked him about dryer sheets on the back seat of the car at a point that is not shown on the videotape. This question is also shown on the videotape. Thus, if Defendant's version is to be believed, Officer Craft would have asked these questions twice and Defendant would have answered them twice, without any indication in the second question or answer that the subject had already been discussed.

The Court finds Officer Craft's testimony about the integrity of the videotape credible and Defendant's description of the omissions not credible. The Court can find no constitutional violation based on alteration of the videotape.

**IT IS HEREBY ORDERED** that Defendant Eric John Meisner's Motion to Dismiss (Doc. #32) is **denied**.

DATED this 21st day of June, 2006.

_David G. Campbell_
David G. Campbell
United States District Judge